UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

DANIEL L. GILLIAM, SR.

               Petitioner,          **No. 03-CV-607(RJA)(VEB)**
                                       **REPORT AND RECOMMENDATION**

    -vs-

DALE ARTUS, Superintendent,
Clinton Correctional Facility,

               Respondent.
_____

## I.      Introduction

*Pro se* petitioner Daniel Gilliam ("Gilliam" or "petitioner") has filed a petition for a writ

of habeas corpus pursuant to 28 U.S.C. § 2254 challenging his conviction on March 15, 1998,

following a jury trial in New York State County Court (Chemung County), on charges of first

degree manslaughter and first degree robbery. Gilliam is currently serving two concurrent terms

of imprisonment of eight and one-third to twenty-five years.

This matter has been referred to the undersigned pursuant to 28 U.S.C. § 636(b) for the

issuance of a report and recommendation regarding the disposition of Gilliams' petition. For the

reasons that follow, I recommend that the petition be dismissed.

## II.     Factual Background and Procedural History

### A.     The Trial

#### 1.     The Prosecution's Case

The conviction here at issue stems from Gilliam's involvement in the stabbing death of

Richard Stalis ("Stalis") during the early morning hours of May 26, 1994. Stalis, who was a

long-time acquaintance of Gilliam's, was stabbed multiple times in his home and died. Gilliam was alleged to have taken cash from Stalis, which he spent later that night on a crack-binge. Gilliam was indicted two counts of murder in the second degree (N.Y. Penal Law §§125.25(1) (intentional), (3) (felony)) one count of robbery in the first degree (N.Y. Penal Law § 160.15(1)). A summary of the relevant testimony from petitioner's trial follows.

Natalis Stalis ("Natalie"), the victim's fourteen-year-old daughter, testified for the prosecution that her father had a complete knife set in a butcher block in his kitchen. T.594-95. According to Natalie, Stalis had a practice of loaning people money. T.597.

On May 24, 1994, Gilliam and Wanda Ramsay ("Ramsay") had been over at Stalis' house for several hours. T.897-903. Before that, Gilliam and Ramsey had bought crack and gotten high.

The next day, May 25, 1994, Stalis had cashed a check for $100 along with his payroll check ($357). T.601-03. Ramsay saw Stalis counting his money at his house and then left at about 3:30 p.m. to go out and buy some more crack. T.913-14. That same day, Alan Hager ("Hager") saw Gilliam and Stalis together at a supermarket, where Stalis was buying cigarettes and beer.

At about 3:30 p.m. on May 25th, Gilliam was over at the house of his girlfriend, Linda Osmun ("Osmun"). T.834. When Osmun dropped Gilliam off at a fast-food restaurant at about 7:00 p.m., he was wearing blue sweatpants made out of a silk-like material, a dark blue jacket with his name on the back, and a baseball cap with lettering on it. T.835.

At about 8:30 p.m., Gilliam walked into the kitchen at Chuck Clark's bar, according to cook Timothy Johnston ("Johnston"). Johnston recalled that Gilliam was wearing a dark blue

coat with lettering on the left breast pocket, basketball warm-up pants, a white shirt, and a gray shirt. Johnston saw Gilliam on and off throughout the evening; at one point, petitioner asked to borrow $10, and Johnston gave him $20. According to Johnston, petitioner left sometime after 12:30 a.m. T.652-56. At around 11:30 p.m. that night, Richard Moore ("Moore") saw Gilliam at Chuck Clark's and had loaned him $10 to play a game of pool; however, he did not stay to watch Gilliam play. Moore recalled that Gilliam was wearing dark basketball warm-up pants, a light colored t-shirt, and a hat. T.645-46, 651. Catherine White ("White") also saw Gilliam at Chuck Clark's; she took a photograph of him. T.1177-82. At about 1:00 a.m., Amy Jerzak ("Jerzak") observed Gilliam in the parking lot of Chuck Clark's; he did not appear intoxicated to her at that time. T.1183-90.

Later, at about 1:30 or 2:00 a.m., Osmun (petitioner's girlfriend) awoke to find that she had a message from Gilliam stating that he was on his way home and was with Stalis. T.839. Maureen Osier ("Osier") testified that at 2:36 a.m., she received a phone call from Gilliam stating that he was at Stalis' house. Gilliam asked Osier if she was planning to send to him the money that he owed Stalis, and requested that she speak with Stalis. Osier did so. T.813-18.

Antoinette Brock ("Brock") sold two bags of crack cocaine to petitioner at about 2:00 or 3:00 a.m. When he arrived at her house, Brock recalled, he appeared nervous. Gilliam smoked the crack while still at Brock's house. He announced that he had $100, and also handed a $20 to Ramsey, who happened to be there as well. T.863-66, 918-19, 975. Debra Agan ("Agan") saw Gilliam at Brock's house, purchasing crack cocaine. T.889-93.

When Gilliam left, he was accompanied by Janice Henderson ("Henderson"). The two of them proceeded to Benjamin Lee's apartment where they smoked some more crack. Gilliam was

wearing a jacket that had blood on it while they were there. T.982, 1020-22.

After leaving Lee's apartment, Gilliam and Ramsey took a cab to Dewittsburgh for what turned out to be an unsuccessful crack run. The cabbie, William Hungerford, noticed that the $10 bill that Gilliam handed him appeared to have blood on it. T.973-85, 1004-11. Gilliam, unaccompanied by Ramsey, returned to Lee's apartment, where he slept until morning. T.1023-25.

At 6:00 a.m. on the morning of May 26th, Ramsey went to Stalis' apartment and found Stalish dead on his couch, with a knife sticking out of his chest. T.915-16. Kelly Caccia ("Caccia"), the next-door neighbor, was awakened by a hysterical Ramsey knocking on her door. T.624-26. Caccia accompanied Ramsey back to Stalis' house where she saw the body in the same condition as Ramsey had described, and the television turned on. T.627-29, 918.

When the police arrived on the scene, they found blood on the floor and the walls. Stalis' wallet was on the coffee table with its contents strewn about the floor. Blood was also found in the bathroom, on the desk in the bedroom, and in the kitchen. A towel with blood on it was found on a chair; underneath the towel was petitioner's baseball cap. T.1103-76. The police recovered about $190 in cash from a can in the kitchen. T.1170.

Later that day, Investigator William Batrowny ("Inv. Batrowny") located Gilliam at his mother's house, and Gilliam agreed to go with him to the police station. Gilliam stated that he had last seen Stalis the previous Saturday, May 21st. T.663-67. On the night of May 25th, Gilliam indicated, he had gone to McDonald's, followed by Chuck Clark's bar. He then walked to a crack-house on South Main Street, where he stayed until he went home to his mother's at about 2:00 or 3:00 a.m. T.668-69. According to Gilliam, he was wearing white sweatpants, three t-

shirts (white, red and gray), a dark blue nylon jacket, and multi-colored socks. T.669. Gilliam turned over his clothes to the police, but the jacket did not match the description provided by other witnesses. T.669, 674-78. When Inv. Batrowny described the jacket he believed Gilliam had been wearing the night before, Gilliam claimed that the jacket had been stolen the previous Saturday night at Chuck Clark's bar. Inv. Batrowny indicated that during their conversation Gilliam gave varying statements about whether he had been wearing a hat. After discussing some other discrepancies in Gilliam's account of his clothing, and ascertaining from petitioner's girlfriend that the jacket he had given to the police was not the same jacket that he had been wearing the night before, Inv. Batrowny read Gilliam the *Miranda* warnings. T.681-84.

Gilliam continued to insist that he had last seen Stalis on May 21, when he had borrowed $40 from Stalis and spent the night on his couch. On May 25, Gilliam stated, he spent the evening at Chuck Clark's, after which he got a ride to a crack-house. T.807-08. While there, Gilliam bought crack with the $30 he had been loaned by various individuals at Chuck Clark's, and smoked it. T.809. Gilliam indicated that he was wearing a black baseball cap with the letter "G" on the front, a dark blue vinyl jacket with the lettering "Danny G" on the back, blue sweatpants, and white and gray t-shirts. T.809-10. Gilliam stated that he removed the hat, jacket, and outer t-shirt when he went inside the crack-house and had forgotten to take them with him when he left. Gilliam stated that pants still had to be at his mother's house. T.810. Gilliam signed a written statement to this effect.

Gilliam's acquaintance, Lee, consented to have the police search his apartment. In a downstairs closet, the police found the jacket petitioner had been described as wearing the night before. The jacket had blood on it. T.1026-27, 1056-61.

The manager of the cab service that Gilliam had used on the night of the stabbing provided the police with the money that had been in the deposit by the cabbie who had driven Gilliam–including a $10 bill with blood on it. T.1014-19, 1043-47.

While he was being detained following his arrest, Gilliam called his girlfriend, Osmun, from jail. During that conversation, Gilliam told her that on the night of May 25th, he had gotten very drunk at Chuck Clark's, had left at about 10:30 p.m., and had ended up at Stalis' house. Gilliam told Osmun that he had been doing drugs that night. Gilliam said that there was a woman at Stalis' house; she left after Stalis gave her some money. Gilliam told Osmun that he then asked Stalis if he would lend him $20. In response, Stalis punched him in the face. Gilliam told Osmun said that he felt that he needed to defend himself, so picked up a knife and "hit" Stalis. T.839-42. After that, Gilliam picked up some money lying on the floor and left Stalis to go get high. T.842-43.

Elaine Laurey ("Laurey"), who was in the visiting room at Chemung County Jail on May 30, 1994, overheard Gilliam say that he had killed Stalis as a result of an argument about money. Gilliam said that Stalis pushed him, and Gilliam then stabbed Stalis. Laurey heard Gilliam say that he wanted money from Stalis to buy drugs, and taken $30 from Stalis which he used to buy drugs in Dewittsburgh. T.1063-67.

Forensic pathologist Jeffrey Baltzer, M.D. ("Dr. Baltzer") performed an autopsy on Stalis. He found small lacerations on the front and rear of the victim's scalp, which resulted in chips in his skull, along with four stab wounds on his chest about five to six inches in depth. One of these stab wounds had cut the sternum (breastbone) in half. The victim also had lacerations and abrasions on both arms, including two defensive wounds on Stalis' right wrist and hand. Dr.

Baltzer concluded that the cause of death was blood loss as a result of the stab wound to the right chest, which penetrated the lung and a major blood vessel. T.1191-1211.

2.      **The Defense Case**

Gilliam testified as the only witness for the defense. He related that he had begun abusing drugs in 1989, becoming addicted to crack cocaine. T.1279. At one point, Gilliam had worked with the District Attorney's office helping to clean up condemned crack-houses. T.1283-86.

On the evening of May 25, 1994, Gilliam was at Chuck Clark's bar. After about six to eight drinks, he left at around 12:45 a.m. on the morning of May 26th. T.1293-94. Gilliam proceeded to a bar called "Good Times" where he met up with Ramsey. The two of them left together and bought some crack, which they smoked on the way over to Stalis' house. T.1295-96. Upon their arrival, Stalis let them in and the three drank some beers together. T.1297-98. Ramsey and Stalis disappeared into the bedroom, while Gilliam watched a movie. T.1298-99. Gilliam eventually left by himself and went over to his girlfriend's house. T.1302.

Gilliam later went to a crack house where he saw Ramsey, whom he gave $20 to buy crack cocaine for him. T.1303. After smoking the crack and drinking beer and gin, Gilliam went over to Stalis' house. T.1304. Stalis had loaned him money about three times; Gilliam had paid back two of the debts and had given him a written "IOU" on one occasion. T.1306. Gilliam telephoned his acquaintance, Osier, at about 2:30 a.m. on the morning of May 26th to make sure that she was wiring him money so that he could pay back Stalis. T.1307. After Stalis spoke to Osier, he agreed to lend Gilliam more money. T.1308. According to Gilliam, Stalis said that Gilliam was probably going to buy crack with the money and commented, "[A]ll you fucking niggers are just alike." T.1310. Gilliam yelled at Stalis and threw down the money, at which

point Stalis punched him in the face, causing him to fall down. T.1310. Gilliam saw Stalis' hand reaching for a large knife that was on the coffee table, but Gilliam was able to grab the knife instead. T.1312-13. Then Stalis grabbed Gilliam's jacket, shouting that he would kill him. T.1313-15. Gilliam stated that he was afraid, because he had been beaten up before by Stalis. Gilliam indicated that he had a "vision" of a gun and then began swinging the knife at Stalis. T.1325. (No gun was ever found at the crime scene and there is no indication that Stalis actually was armed.) After he struck Stalis the last time with the knife, Gilliam went to the bathroom and washed the blood from his face. T.1351. Gilliam picked up $50 that was lying on the floor, but left the credit cards that had fallen from Stalis' wallet. T.1351-52.

Gilliam then proceeded to a crack house where he saw Ramsey, whom he gave money to buy crack for him. T.1353. After that, Gilliam left with Henderson, who followed him out because she knew he had crack. T.1354-55. They attempted to buy more crack at a different location but were unsuccessful; the two then parted company and Gilliam took a cab to McArthur's bar. T.1356-58. At about 7:00 a.m., Gilliam returned to his mother's house and then walked to the store for her. T.1358-59.

Gilliam testified that his statement to the police was not true, and that he was not thinking rationally at the time. T.1360-61. He denied having any intent to rob or kill Stalis. T.1363.

At defense counsel's request, the trial court charged the jury as to the lesser included offenses of first degree intentional manslaughter and second degree reckless manslaughter. T.1456. The trial court also instructed the jury on the defense of justification under New York's self-defense statute. T.1458-59. The jury returned a verdict finding Gilliam guilty of manslaughter in the first degree and guilty of robbery in the first degree. T.1639-41. Gilliam was

acquitted of the charges of second degree murder.

**B.    Sentencing and Post-Conviction Proceedings**

Gilliam appeared for sentencing on March 15, 1995, and received concurrent, indeterminate terms of eight and one-third to twenty-five years imprisonment on the manslaughter and robbery convictions.  The sentences imposed were the maximum allowable for each crime. *See* N.Y. Penal Law § 70.02(3)(a)),

It appears that Gilliam initially retained an attorney named Richard Baumgarten to represent him on appeal; attorney Baumgarten, however, did not file a brief on Gilliam's behalf. *See* Resp't Mem. at 8. Appointed counsel Eliza Mulhern then was assigned to assist him on his appeal. Attorney Mulhern, after reviewing the record, sought to be relieved on the ground that she found no non-frivolous issues to raise on direct appeal. Gilliam wrote the Appellate Division *pro se* alleging that a number errors occurred at his trial and argued that he had not received the effective assistance of counsel.

Upon review of the record, the Appellate Division found "the existence of various potential nonfrivolous [sic] issues of 'arguable merit,' . . . including whether the People disproved self-defense beyond a reasonable doubt, whether County Court properly denied defendant's request to charge the lesser included offense of petit larceny and whether defendant's sentence was harsh and excessive." *People v. Gilliam*, 281 A.D.2d 657 (App. Div. 3d Dept. 2001), *see also* Resp't Ex. A. Attorney Mulhern's request to be relieved was granted, and new appointed counsel, Norbert Higgins, was assigned.

Attorney Higgins filed a brief on Gilliam's behalf arguing that (1) trial counsel was ineffective on the basis that he was suspended from the practice of law in between the time trial

ended and before Gilliam's sentencing, had requested numerous adjournments and failed to appear for pre-trial conferences, had failed to properly investigate and prepare for trial, did not rehearse petitioner's testimony with him and did not notify petitioner that he planned to call him as a witness, and allowed petitioner's mother to have an outburst in front of the jury; (2) the trial court erroneously denied the defense request to charge the lesser included offense of petit larceny; (3) the prosecution did not disprove the defense of self-defense beyond a reasonable doubt; and (4) the sentence was harsh and excessive.

On December 5, 2002, the Appellate Division unanimously affirmed Gilliam's conviction after thoroughly discussing the issues raised by appellate counsel. *People v. Gilliam*, 300 A.D.2d 701 (App. Div. 3d Dept. 2002). The New York Court of Appeals denied leave to appeal on March 4, 2003. *People v. Gilliam*, 99 N.Y.2d 628 (N.Y. 2003).

The instant habeas petition was filed on or about July 16, 2003. *See* Petition (Dkt. #1). On November 10, 2003, the Court (Arcara, D.J.) dismissed without prejudice three unexhausted claims of ineffective assistance of trial counsel and stayed the remaining claims asserted by Gilliam pursuant to *Zarvela v. Artuz*, 254 F.3d 374 (2d Cir. 2001) to allow Gilliam to exhaust his state court claims. *See* Order (Dkt. #5). On August 19, 2004, Gilliam filed a *pro se* application for a writ of error *coram nobis* in the Appellate Division asserting that trial counsel had been ineffective on numerous bases. *See* Respondent's Exhibit ("Resp't Ex.") F, submitted in support of Respondent's Declaration in Opposition to the Petition (Dkt. #14). Gilliam also claimed that the trial court improperly failed to allow the introduction of a psychological report into evidence. *See id.* Finally, Gilliam challenged the performances of attorney Baumgarten, whom he had first retained to perfect his appeal; and attorney Mulhern, who had been relieved from representing

Gilliam by the court after she found no non-frivolous issues to raise on appeal and replaced by attorney Higgins. The prosecution did not oppose Gilliam's *coram nobis* application. On December 1, 2004, the Appellate Division unanimously denied the application without opinion. Respondent states that Gilliam's leave application is missing from the available record but notes that, in a certificate dated January 31, 2005, the New York Court of Appeals denied leave to appeal. *People v. Gilliam*, 4 N.Y.3d 763 (N.Y. 2005).

**C.    The Instant Habeas Petition**

Once Gilliam completed the state-court review process with regard to his *coram nobis* application, he returned to federal court and the stay of the instant proceedings was lifted on May 24, 2005. *See* Order (Dkt. # 12).

Gilliam asserts the following grounds for relief in his habeas petition:

(1) the trial court improperly disallowed the introduction of a psychological report "questioning the state of mind and physical state of being during the time petitioner was being attacked";

(2) his trial counsel provided ineffective assistance because counsel

> (a) advised petitioner he would be "better off with an all white jury," and thus petitioner was deprived a jury of his peers,
> (b) failed to advise petitioner of his trial strategy,
> (c) was under supervision by the bar association and failed to notify petitioner that he had been suspended when he took petitioner's case,
> (d) failed to conduct, as promised, an investigation which would have revealed that the crime could not have taken place in the manner the prosecution argued at trial,
> (e) failed to challenge the medical examiner's report as inaccurate,
> (f) was disbarred after representing petitioner, and
> (g) sent an assistant to appear on petitioner's behalf at pre-trial proceedings;

(3) his initial appellate counsel Baumgarten was ineffective for

(a) failing to argue, upon petitioner's request, that a toxicology report of Stalis should have been introduced at trial, which would have demonstrated that he was intoxicated and, thus, had attacked petitioner, and

(b) failing to correspond with petitioner;

(4) his second appellate counsel Mulhern was ineffective for failing to find any colorable issues to raise; and

(5) his third and final appellate counsel Higgins was ineffective for merely raising the potentially meritorious issues suggested by the Appellate Division in its order relieving Mulhern as assigned counsel.

See Petition (Dkt. #1); see also Resp't Ex. J.

Respondent has raised the defenses of non-exhaustion and procedural default with regard to a number of Gilliam's claims. See Resp't Mem. at 14-18 (Dkt. # 15). In the alternative, respondent has argued, all of Gilliam's claims are meritless. See Resp't Mem. at 19 et seq. (Dkt. #15). Gilliam submitted a reply to respondent's answer. See Petitioner's "Reply to Respondent's Report" (Dkt. #17). In it, Gilliam does not address any of the legal arguments raised by respondent but takes issue with a number of relatively trivial factual matters, essentially contending that the stenographic record of his criminal proceedings has been "mistranslated".

Respondent concedes that petitioner has exhausted the following sub-parts of his claim that trial counsel was ineffective by raising them on direct appeal in the Appellate Division, and in his application for leave to appeal to the New York Court of Appeals: (1) his trial counsel, Ben Darden, was suspended from practice a month after the trial and a month before sentencing (2) trial counsel generally failed to adequately prepare for trial; (3) trial counsel allowed another attorney to appear at pre-trial proceedings on his behalf; and (4) trial counsel failed to rehearse and prepare petitioner for his trial testimony. See Resp't Mem. at 14 (Dkt. #15); Resp't Ex. B at 7-9.

Respondent also admits that Gilliam has exhausted each of his claims relating to his appellate attorneys by raising them in his application for a writ of error *coram nobis*, and in his leave application to the New York Court of Appeals, in "arguably constitutional terms." *Id.* at 14 (citing Resp't Ex. F).

However, respondent argues that Gilliam has failed to exhaust the remainder of his claims of ineffective assistance of trial counsel as well as his claim regarding the trial court's erroneous ruling in refusing to allow the introduction of the psychiatric report and the testimony of the medical expert. These contentions will be discussed below with regard to each claim respectively.

For the reasons that follow, I recommend that Gilliam's petition be dismissed.

## III.    Standard of Review

Under the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), a federal court may grant habeas relief to a state prisoner only if a state court conviction "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or if it "was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." *Id.* § 2254(d)(2). A state court decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 413, 120 S.Ct. 1495, 1523 (2000); *accord Harris v. Kuhlmann*, 346 F.3d 330, 342 (2d Cir.2003). The phrase, "clearly established Federal law, as determined by the Supreme Court of the United

States," limits the law governing a habeas petitioner's claims to the holdings (not *dicta*) of the Supreme Court existing at the time of the relevant state-court decision. *Williams*, 529 U.S. at 412; *accord Sevencan v. Herbert*, 342 F.3d 69, 73-74 (2d Cir. 2002), *cert. denied*, 540 U.S. 1197 (2004).

A state court decision is based on an "unreasonable application" of Supreme Court precedent if it correctly identified the governing legal rule, but applied it in an unreasonable manner to the facts of a particular case. *Williams*, 529 U.S. at 413. The inquiry for a federal habeas court is not whether the state court's application of the governing law was erroneous or incorrect, but rather whether it was "objectively unreasonable." *See id.* at 408-10; *see also Eze v. Senkowski*, 321 F.3d 110, 125 (2d Cir. 2003). Under AEDPA, "a determination of a factual issue made by a State court shall be presumed to be correct. The [petitioner] shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *see also Parsad v. Greiner*, 337 F.3d 175, 181 (2d Cir.) ("The presumption of correctness is particularly important when reviewing the trial court's assessment of witness credibility."), *cert. denied sub nom. Parsad v. Fischer*, 540 U.S. 1091, 124 S.Ct. 962 (2003). A state court's findings "will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

IV.    **Analysis of the Claims Raised in the Petition**

A.    **Trial Court Error – Preclusion of Psychiatric Report and Expert Testimony**

In his habeas petition, Gilliam asserts that the trial court improperly precluded a psychiatrist, Dr. Leifer, from testifying on his behalf at trial, and did not allow the admission of a

report by Dr. Leifer allegedly "questioning the state of mind and physical state of being [of petitioner] during the time petitioner was being attacked."[1] Gilliam also raised this claim in his *coram nobis* application. *See* Resp't Ex. J at 7.

## 1.    Exhaustion and Procedural Default

It is well-settled that a federal court may not consider the merits of a claim unless that claim was fairly presented to the "highest state court from which a decision can be had." *Daye v. Attorney Gen'l of N.Y.*, 696 F.2d 186, 190 n.3 (2d Cir. 1982) (*en banc*), *on remand*, 712 F.2d 1566 (2d Cir. 1983), *cert. denied*, 464 U.S. 1048 (1984); *see also Picard v. Connor*, 404 U.S.

---

[1]    The first notice of petitioner's intent to call Dr. Leifer, a psychiatrist, was given by defense counsel after the prosecutor completed cross-examination of petitioner. The prosecution then moved to preclude any testimony by Dr. Leifer, based upon the failure of the defense to serve them with notice of his intent to offer psychiatric evidence as required under New York law pursuant to C.P.L. § 250.10. T. 1412. Defense counsel responded that it was not his intent "to have Doctor Leifer give any psychiatric testimony, regarding the present or past condition of" petitioner; rather, counsel wished to call him to ask him to explain extreme emotional distress ("EED") to the jury. According to defense counsel, Dr. Leifer was not going to give testimony about petitioner's past or present mental condition. T. 1414.  Over the weekend recess, the trial court allowed the parties to research the issue of whether expert testimony concerning the subject of EED was permissible. T. 1417-18.

After the recess, defense counsel submitted a brief, arguing that expert witnesses may properly testify about issues involving professional or scientific knowledge or skills not within the range of ordinary training or intelligence of the jurors. T.1423-25. Defense counsel then stated that he did not intend to present the report of a psychiatric examination, because "[t]here was no psychological or psychiatric testing of [petitioner]. All Doctor Leifer did was he interviewed [petitioner]." T. 1427, 1434. In opposition, the prosecutor argued that if the Dr. Leifer offered any psychiatric evidence during his testimony, then notice under C.P.L. § 250.10 was required. If, however, Dr. Leifer was not offering any testimony to support petitioner's EED defense or psychiatric evidence, then the evidence would arguably be irrelevant. T.1429-30. The prosecutor also stated that he had learned that day that Dr. Leifer had examined petitioner at the Chemung County Jail about six months earlier. T.1430. The prosecutor argued that this delay in revealing the existence of psychiatric evidence substantially prejudiced the state's case. T.1430-31. In response, defense counsel continued to argue that he was merely offering Dr. Leifer as an expert witness to testify about the subject of EED generally, and nothing more. T.1436-39.

The trial court granted the People's motion to preclude Dr. Leifer's testimony, finding that the first indication of the EED defense arose during petitioner's testimony, and after the People had rested. T. 1447-49. 1447-78). Additionally, the court noted that the first notice of petitioner's intent to call Dr. Leifer was given after completion of the People's cross-examination of petitioner. T. 1448. The trial court found that the proposed testimony constituted psychiatric evidence, and C.P.L. § 250.10 required advance notice to the prosecution, which was not given by the defense until after Gilliam testified. The trial court further found that the delay prejudiced the prosecution because it was unable to address questions to Gilliam regarding the issue, and had no opportunity to have Gilliam examined by its own expert to determine whether it wished to offer additional evidence. T.1448-49. In addition, the trial judge determined, the offer of proof established that Dr. Leifer's testimony "invade[d] the province of the court and the jury" because "[t]he court is charged with defining for the jury in its charge the affirmative defense of extreme emotional disturbance, which is a question of fact for the jury." T.1449. In light of the total circumstances of the case, the trial court precluded Dr. Leifer's testimony. T.1448.

270, 275 (1971). Although Gilliam raised, in his *coram nobis* petition, the claim that the trial court improperly precluded the admission of a psychiatric report and the testimony of his expert at trial, that claim is nonetheless unexhausted. This is because "[t]he exhaustion doctrine requires that a prisoner seeking to upset his conviction on federal grounds must have given the state courts a fair opportunity to review his federal claim and correct the alleged error." *Dean v. Smith*, 753 F.2d 239, 241 (2d Cir. 1985) (citing, *inter alia*, *Picard v. Connor*, 404 U.S. at 275). Thus, where a petitioner has "used the used the wrong procedural vehicle [to assert a claim], the state courts never had a fair opportunity to pass on [the] claim." *Id.* (citing *Ex parte Hawk*, 321 U.S. 114 (1944) (*per curiam*); *Harris v. Superior Court*, 500 F.2d 1124, 1126 (9th Cir.1974) (*en banc*), *cert. denied*, 420 U.S. 973 (1975).

I agree with respondent that Gilliam's claim concerning the preclusion of the psychiatric report and expert testimony is unexhausted because petitioner raised it by means the wrong procedural vehicle. Although Gilliam asserted the claim in his *coram nobis* application, in New York, such an application is not the proper means for asserting claims of error at the trial-court level. Rather, *coram nobis* is used to challenge a criminal conviction "only . . . on the ground that the defendant was deprived of the effective assistance of appellate counsel." *People v. Gordon*, 183 A.D.2d 915, 584 N.Y.S.2d 318, 318 (App. Div. 2d Dept. 1992) (citing *People v. Bachert*, 69 N.Y.2d 593, 600 (N.Y. 1987) (quoted in *Turner v. Artuz*, 262 F.3d 118, 123 (2d Cir. 2001)). Thus, petitioner's having raised an issue *other than* ineffective assistance of appellate counsel in a *coram nobis* proceeding does not constitute a "fair presentation" of the issue to a state court for exhaustion purposes. *Castille v. Peoples*, 489 U.S. 346, 351 (1989) ("[W]here the claim has been presented for the first and only time in a procedural context in which its merits

will not be considered unless 'there are special and important reasons therefor,'" an

"assumption" that the state has considered it on the merits "is not appropriate.") (petition for

*allocatur* presented to Pennsylvania Supreme Court does not exhaust state remedies); *Ex parte*

*Hawk*, 321 U.S. 114 (1944) (application to Nebraska Supreme Court for original writ of habeas

corpus does not exhaust state remedies); *accord*, *e.g.*, *Lloyd v. Walker*, 771 F. Supp. 570, 573

(S.D.N.Y. 1991).

"When a petitioner has not properly presented his claim to a state for consideration on the

merits, but 'it is clear that the state court would hold the claim procedurally barred,' a federal

habeas court need not require that the claim be presented to a state court." *Lloyd v. Walker*, 771

F. Supp. at 573 (quoting *Harris v. Reed*, 489 U.S. 255, 263 n. 9 (1989)); *see also Grey v. Hoke*,

933 F.2d 117, 119, 120-21 (2d Cir. 1991). Such is the case here: if Gilliam now filed a motion to

vacate his conviction in the court that rendered the judgment of conviction pursuant to New

York Criminal Procedure Law ("C.P.L.") § 440.10, that court would be required to deny the

claim because "sufficient facts appear[ed] on the record" for the claim to have been raised on

direct appeal. N.Y. CRIM. PROC. LAW § 440.10(2)(c). The Second Circuit has explained that

under these circumstances, notwithstanding petitioner's failure to present the claim to a state

court, the exhaustion requirement is "deemed" to have been satisfied. *Castille v. Peoples*, 489

U.S. at 351; *Engle v. Isaac*, 456 U.S. 107, 125-26 & n. 28 (1982); *Grey*, 933 F.2d at 120-21.

However, Gilliam's forfeiture of his claim of trial court error in state court by failing to present it

to the proper court bars him from litigating the merits of the claim in federal habeas proceedings,

absent a showing of cause for the procedural default and prejudice resulting therefrom, or a

showing that the failure to consider the federal claim will result in a "fundamental miscarriage of

justice." *Coleman v. Thompson*, 501 U.S. 722 (1991); *Murray v. Carrier*, 477 U.S. 478, 485 (1986). *See also Wainwright v. Sykes*, 433 U.S. 72, 86-87 (1977); *Grey*, 933 F.2d at 120-21. This Gilliam has not attempted to do, and indeed, cannot do on the record before the Court. Accordingly, I recommend that his claim of trial court error in precluding the admission of the psychiatric report and testimony of the medical expert be dismissed as procedurally defaulted.

### B.     Ineffective Assistance of Trial Counsel

#### 1.     Exhaustion and Procedural Default

Respondent argues that certain claims of ineffective assistance of trial counsel that Gilliam presented, for the first time, in his *coram nobis* application are unexhausted. In particular, respondent is referring to the claims that petitioner's trial counsel was ineffective because (1) his disbarment subsequent to petitioner's trial prejudiced his defense; (2) he allegedly advised petitioner that he would be "better off with an all-white jury"; (3) and he failed to challenge the medical examiner's testimony concerning the victim's approximate weight. *See* Resp't Mem. at 15 (Dkt. #15) (citing Resp't Ex. F); *see also id.* at 15 n.7.

As noted above, in New York, the writ of error *coram nobis* lies for the purpose of seeking to vacate an order determining an appeal on the ground that the defendant was deprived of the effective assistance of *appellate* counsel. *Turner*, 262 F.3d at 123 (quotations omitted). In other words, the only constitutional claim Gilliam was permitted to raise in seeking a writ of error *coram nobis* was ineffective assistance of *appellate* counsel, a claim that is distinct from his claims of ineffective assistance of *trial* counsel. "[A] petitioner cannot show exhaustion unless he has 'fairly presented to an appropriate state court the same federal constitutional claim that he now urges upon the federal courts.'" *Id.* (quoting *Klein v. Harris*, 667 F.2d 274, 282 (2d

Cir.1981) (emphases supplied)). This Gilliam has not done. His claim of ineffective assistance of trial counsel, and its sub-parts, raised as "stand-alone" claims in his *coram nobis* application, remain unexhausted.

I agree with respondent that these claims of ineffective assistance of trial counsel "should be deemed exhausted because any attempt at exhaustion [by means of a C.P.L. § 440.10 motion] in the face of this procedural default would be futile." *Reyes v. Keane*. Although, as the Second Circuit has noted, "[d]enial of a 440.10 motion, pursuant to 440.10(2)(c), will not always be appropriate in the ineffective assistance context," Gilliam's claims do "not fall within any of the exceptions noted by the New York courts." *Id.* (citing *People v. Harris*, 109 A.D.2d 351, 491 N.Y.S.2d 678, 687 (holding that collateral motion under C.P.L. § 440.10 is proper vehicle for challenging trial counsel's performance where trial record insufficient to resolve such a claim of ineffective assistance of trial counsel), a*ppeal denied*, 66 N.Y.2d 919 (1985)); *see also Sweet v. Bennett*, 353 F.3d at 140 (failure to object to jury charge); *Aparicio v. Artuz*, 269 F .3d 78 (2d Cir.2001) (same); *Reyes v. Keane*, 118 F.3d 136, 139 (2d Cir.1997) (failure to object on double jeopardy grounds). As respondent points out, the factual bases for his unexhausted claims of ineffective assistance of trial counsel were known to him at the time of his direct appeal and were demonstrable without resort to matters outside the record. Moreover, Gilliam had different appellate counsel on direct appeal, who did assert some claims of ineffective assistance of trial counsel. Thus, there is no reason why Gilliam's remaining unexhausted claims could not have been raised on direct appeal.

Gilliam is therefore "deemed" to have exhausted his state remedies for the ineffective assistance claim by his procedural default on that issue. Although Gilliam's claim of ineffective

assistance must be "deemed exhausted," I nonetheless find that, by defaulting on the claim in state court, he has forfeited review of it in federal habeas court unless he can show cause and prejudice, or that he is "actually innocent" of the charges on which he was convicted. As discussed above in this Report and Recommendation, Gilliam has failed to make any such showing. I therefore recommend finding that the following claims should be deemed exhausted but procedurally defaulted from habeas review: (1) trial counsel's disbarment subsequent to petitioner's trial prejudiced the defense; (2) trial counsel's alleged advice to petitioner that he would be "better off with an all-white jury" was ineffective; and (3) trial counsel's failure to challenge the medical examiner's testimony concerning the victim's approximate weight was ineffective. *See* Resp't Mem. at 15 (Dkt. #15) (citing Resp't Ex. F); *see also id.* at 15 n.7. Accordingly, I recommend dismissing them on the basis of the unexcused procedural default.

### 2. Merits of the Exhausted Claims of Trial Counsel's Ineffectiveness

I turn next to consideration of those claims of ineffective assistance of trial counsel which respondent concedes have been fully exhausted: (a) trial counsel was suspended from practice a month after trial and a month before sentencing; (b) trial counsel generally failed to investigate and adequately prepare for trial; (c) trial counsel improperly allowed another attorney appear at pre-trial proceedings in his stead; and (d) trial counsel failed to prepare petitioner for his trial testimony. *See* Resp't Mem. at 18 (Dkt. #15).

On direct appeal, the Appellate Division rejected these claims as follows:

Here, defendant's attorney made the appropriate pretrial motions, competently performed at trial as demonstrated by his adequate opening and closing arguments to the jury, presented logical defenses to the various counts of the indictment, made numerous effective objections and extensively cross-examined the People's witnesses. Tellingly, his efforts convinced the jury that defendant was not guilty of murder in the second degree. On this record, we do not find that counsel was

ineffective.

*People v. Gilliam*, 300 A.D.2d at 701, 752 N.Y.S.2d at 724. The claims raised by petitioner on

direct appeal clearly were adjudicated on the merits in state court and therefore AEDPA's

standard of review, *see* 28 U.S.C. §§ 2254(d)(1), (2), applies. As discussed more particularly

below, it is apparent that trial counsel provided competent assistance. In the face of extremely

compelling and graphic evidence of petitioner's guilt, including the testimony of two witnesses

who testified that they had overheard petitioner say, or had been told by petitioner himself, that

he had killed his long-time acquaintance the victim for money-related reasons, counsel strongly

advocated for petitioner, and successfully obtained an acquittal on the top count of the

indictment, murder in the second degree. Thus, the Appellate Division's conclusion that

petitioner's counsel provided effective assistance was neither contrary to, or an unreasonable

application of clearly established Supreme Court law, nor an unreasonable application of the

facts presented in the state court proceeding. *See* 28 U.S.C. §§ 2254(d)(1), (2).

a. **General Legal Principles Applicable to Ineffectiveness Claims**

It is well settled that the standard for reviewing a claim of ineffective assistance of trial

counsel is set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), wherein the Supreme

Court held that in order to prevail on an ineffective assistance claim, a petitioner must show that

his counsel supplied deficient representation and that the petitioner suffered prejudice as a result

of that deficient performance. *Id.* at 687. Under the "performance" prong, counsel's conduct

must have "so undermined the proper functioning of the adversarial process" that the process

"cannot be relied on as having produced a just result." The Supreme Court instructed that

counsel is "strongly presumed" to have rendered adequate assistance and to have made all

significant

decisions in the exercise of reasonable professional judgment. *Id.* at 686, 689-90. "[T]he

defendant must overcome the presumption that, under the circumstances, the challenged

action 'might be considered sound trial strategy.'" 466 U.S. at 689 (quotation omitted). In this

regard, "strategic choices made after thorough investigation of law and facts relevant to plausible

options are virtually unchallengeable." *Id.* at 690. As to the second prong, the petitioner "must

show that there is a reasonable probability that, but for counsel's unprofessional" or erroneous

advice, the result of the trial would have been different. *Id.* at 694. The *Strickland* standard is

laid out in the conjunctive; that is, a petitioner must satisfy the requirements of both prongs in

order to qualify for relief.  A reviewing court need not address both and, where the reviewing

court can "dispose of an ineffective claim on the ground of lack of sufficient prejudice," it should

do so. *Id.* at 697.

### b.      Alleged Bases of Trial Counsel's Ineffectiveness

I turn first to Gilliam's claim that his defense was prejudiced by trial counsel's

subsequent involvement in disciplinary proceedings and ultimate disbarment. On January 23,

1995, the Appellate Division, Third Department, granted the Committee on Professional

Standards' motion to suspend petitioner's trial counsel, Benjamin Darden, for his failure to

appear at a disciplinary hearing pursuant to the court's subpoena. Resp't Mem. at 31 (Dkt. #15)

(citing *In re Darden*, 211 A.D.2d 972, 623 N.Y.S.2d 162 (App. Div. 3d Dept. 1995)). The

Appellate Division suspended attorney Darden from the practice of law, effective February 13,

1995. As Gilliam's trial concluded on January 30, 1995, defense counsel was not suspended at

the time he represented petitioner at trial. On March 13, 1995, the Appellate Division stayed the

order of suspension, "effective immediately," until further order of that court. *Id.* (citing *In re Darden*, 213 A.D.2d 851, 624 N.Y.S.2d 970 (App. Div. 3d Dept. 1995)). Thus, on March 15, 1995, when counsel appeared with Gilliam for sentencing, Darden technically was not suspended from practicing law due to the order staying the suspension entered two days previously.

On March 28, 1997, a little more than two years after the conclusion of Gilliam's trial and sentencing, the Appellate Division again suspended attorney Darden from the practice of law for "converting client funds, commingling, failure to maintain a proper escrow account, failure to communicate with clients and others on their behalf, and failure to cooperate" with the investigation into the allegations of misconduct. Resp't Mem. at 32 (citing *In re Darden*, 237 A.D.2d 871, 656 N.Y.S.2d 397 (App. Div. 3d Dept. 1997)). Three months later, after finding that, *inter alia*, attorney Darden had converted a great deal of money by charging an excessive fee and had commingled personal funds, the Appellate Division issued an order barring him from the practice of law. *Id.* (citing *In re Darden*, 240 A.D.2d 844, 658 N.Y.S.2d 718 (App. Div. 3d Dept. 1997)).

Gilliam has not alleged, and on the present record, I cannot discern, how his case specifically was prejudiced by defense counsel's involvement in disciplinary proceedings. I note that defense counsel had not been suspended or disbarred during any of the times that he made appearances for Gilliam. Furthermore, trial counsel was not suspended or disbarred for his alleged incompetence in connection with his representation of Gilliam or any other individual at trial. This is not to express any endorsement or condonation of the egregious examples of misconduct by trial counsel, but merely to observe that Gilliam has pointed to no portion of the disciplinary proceedings against his former attorney which relates to his own case specifically or

to counsel's general skills as a criminal litigator. In other words, there is no indication of how the outcome of petitioner's trial would have been any different had trial counsel *not* been subject to disciplinary proceedings. Thus, Gilliam is unable to establish the "prejudice" prong of the *Strickland* test based on defense counsel's suspension and disbarment subsequent to the conclusion of his representation of Gilliam at trial.

Turning next to the contention that trial counsel failed to prepare adequately for trial, Gilliam contends that counsel should have discovered that the victim attacked him in the living room, where Stalis ultimately died on the couch, and not the kitchen–Gilliam states that clearly the altercation could not have taken place in the kitchen, since the knife was found on the living room coffee table and the plants in the kitchen were undisturbed.

Here, counsel presented a defense of justification and extreme emotional disturbance. Thus, he did not dispute that a fight had occurred, and it was not particularly significant to the defense where the struggle had started. It was apparent that an altercation had taken place, and there was blood in other rooms of the apartment, signifying that the struggle was not solely contained to the living room,  Furthermore, the alleged facts which defense counsel should have discovered prove nothing–and, Gilliam easily could have brought the knife into the living room or righted any plants that had been tipped over. "A particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Wiggins v. Smith*, 593 U.S. 510, 521-22 (2003).  It was clearly not unreasonable for trial counsel to have decided not to focus his investigation on an analysis of the scene of the crime, as there is no indication what a further investigation into the scene would have gained for petitioner. Even if trial counsel could have determined that the

knife was in the living room, and that the struggle did not originate in or progress to the kitchen, there nevertheless is no reasonable possibility that the outcome of the trial would have been different. Accordingly, Gilliam is unable to show how he was prejudiced by this alleged shortcoming in trial counsel's preparation of his defense.

Third, Gilliam contends that it was improper for trial counsel to allow another attorney, who identified himself as "second seat" to defense counsel, to appear on his behalf at several pre-trial court appearances. Defense counsel's use of substitute counsel a pre-trial proceeding, in and of itself, is insufficient to demonstrate that counsel failed to provide effective assistance. *See Skinner v. Duncan*, No. 01 Civ.6656 DAB AJP, 2003 WL 21386032, at *35 (S.D.N.Y. June 17, 2003) (petitioner alleged that trial counsel was ineffective because she failed to appear at his arraignment for witness tampering and intimidation, indictment number 8190/96, which he asserts was "the day of the dismissal" of that indictment; however, where petitioner did not claim, and district court did not find, that counsel's "failure to appear prejudiced [petitioner] in any way," there was no ineffectiveness.); *Jordan v. DuFrain*, No. 98 Civ. 4166(MBM), 2003 WL 1740439, at *5 (S.D.N.Y. Apr. 2, 2003) (petitioner argued that the trial court should have required defense counsel to give "a compelling legal or personal reason for his absence for the three consecutive days he failed to appear at sentencing of petitioner"; habeas court found that trial court's failure to demand that the attorney account for his absence was not a ground for federal habeas relief and petitioner's claim that counsel's performance "influenced the trial court in a prejudicial manner towards petitioner" was "unsupported by any evidence"); *Davis v. Kelly*, 2000 U.S. Dist. LEXIS 10959, at *66-67 (S.D.N.Y. Aug. 2, 2000) (counsel's failure to appear at fourteen out of eighteen calendar calls did not constitute ineffective assistance, where petitioner

failed to point to any specific act counsel should have performed to prepare the defense better, and no prejudice resulted). Here, Gilliam has not identified any specific act that defense counsel should have performed more competently than substitute counsel with respect to the pre-trial proceedings. Thus, he cannot demonstrate that he was prejudiced by any failure of his defense counsel to appear and to send substitute counsel in his stead.

Fourth and finally, I turn to Gilliam's complaint that trial counsel allegedly failed to keep him informed of trial strategy with regard to his taking of the stand and testifying in his own defense. Gilliam points to the following exchange that occurred between him and trial counsel at the conclusion of his direct testimony:

> Counsel: Have I sat down with you and rehearsed what you were saying here today?
> Petitioner: No, sir. You didn't even let me know I was going to testify today.
> Counsel: Did I tell you that we were going to conduct a demonstration today?
> Petitioner: No, sir. You did not.
> Counsel: Did you, did I give you a prepared list of questions that I was going to ask you?
> Petitioner: No, you did not.
> Counsel: Did I appear to be reading from any list of questions as I questioned you?
> Petitioner: No, you don't [sic].
> Counsel: Daniel L. Gilliam, I ask you now, in front of a jury of your peers, did you rob and murder Richard Stalis?
> Petitioner: No, sir.

Resp't Mem. at 30 (citing T.1363-34)). The foregoing colloquy demonstrates, according to Gilliam, that he was unaware he was going to be called as a witness and that defense counsel never discussed with him the possibility of him testifying. Resp't Mem. at 30 (citing Resp't Ex. J at 8).

A defendant has "the ultimate authority" to determine "whether to plead guilty, waive a jury, testify in his or her own behalf, or take an appeal," and, thus, counsel must consult with the

defendant before taking those courses of action, *Jones v. Barnes*, 463 U.S. 745, 751 (1983);

*Wainwright v. Sykes*, 433 U.S. 72, 93 (1977). A reasonable person, reading the above-quoted

exchange between defense counsel and petitioner, would not take it to indicate that counsel had

not discussed with petitioner whether he wished to waive his Fifth Amendment privilege against

self-incrimination and testify at trial–contrary to Gilliam's assertion. That aspect of Gilliam's

claim is frivolous. Although the record seems to indicate that Gilliam was unaware that he was

going to be called to testify on the particular day that he did testify, there is no suggestion that he

was totally unaware that he was going to be testifying in his own behalf as part of his defense.

Such an assertion is patently illogical on its face.

Although trial counsel has a duty to consult with a client regarding "important decisions,"

including questions of trial strategy, *Strickland*, 466 U.S. at 888, that obligation does not require

counsel to obtain the defendant's consent to "every tactical decision." *Taylor v. Illinois*, 484 U.S.

400, 417-18 (1988) (attorney has authority to manage most aspect of the defense without

obtaining his client's approval). What Gilliam complains of here constitutes a strategic decision

by counsel which was neither unreasonable nor detrimental to the defense case. Defense

counsel's handling of Gilliam's testimony appears to have been designed to undercut any

potential assertion by the prosecutor that Gilliam's testimony was "canned" or overly rehearsed

and to counter any attacks on his client's veracity and the credibility of his version of events.

Moreover, it is clear that Gilliam suffered no prejudice by not having rehearsed what he was

going to say before testifying: Through his testimony, he was able to advance the defenses of

self-defense and extreme emotional disturbance. And, clearly, petitioner's testimony benefitted

him to the extent that the jury found him not guilty of intentional murder and instead convicted

him of the lesser crime of manslaughter. As was the case with the other claimed errors, I cannot find that this aspect of trial counsel's performance prejudiced Gilliam's defense.

Gilliam has failed to show how any of the alleged shortcomings on the part of trial counsel discussed above had any effect on the outcome of his trial. Because he is unable to demonstrate he was prejudiced by trial counsel's representation of him, I recommend that his claims of ineffective assistance of trial counsel be dismissed.

### C.    Ineffective Assistance of Appellate Counsel

In his habeas corpus petition, Gilliam argues that (1) his initial appellate counsel was ineffective for (a) failing to argue, upon petitioner's request, that a toxicology report of the victim should have been introduced at trial, which would have demonstrated that he was intoxicated and, thus, had attacked petitioner, and (b) failing to correspond with petitioner; (2) his second appellate counsel was ineffective for failing to find any arguable issues to raise; and (3) his third appellate counsel was ineffective for raising only the potentially meritorious issues suggested by the Appellate Division. Respondent concedes that all of these contentions have been exhausted. *See* Resp't Mem. at 37 (Dkt. #15).

As an initial matter, any alleged deficiencies on the part of petitioner's first two appellate attorneys are of no moment, because the Appellate Division appointed a third appellate attorney who ultimately submitted a brief on his behalf. I agree with respondent that the performance of those attorneys is irrelevant as to whether the third appellate counsel provided effective assistance.

Although the Appellate Division denied petitioner's claim of ineffective assistance of appellate counsel without discussion, its ruling nonetheless constitutes an "adjudication on the

merits" entitled to deference under AEPDA. *See Sellan v. Kuhlman*, 261 F.3d 303 (2d Cir. 2001) (holding that the state court's summary denial of petitioner's *coram nobis* application constituted an adjudication on the merits for purposes of 28 U.S.C.§ 2254(d), despite the absence of any discussion or explicit reference to the federal claim). Gilliam, in order to obtain habeas corpus relief, must therefore show that the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court." 28 U.S.C. § 2254(d)(1).

The *Strickland v. Washington* two-pronged test applies to evaluations of appellate counsel's performance. *E.g.*, *Aparicio v. Artuz*, 269 F.3d at 95. In order to satisfy the first prong of *Strickland*, it is not enough for a petitioner to show that appellate counsel omitted a non-frivolous argument, as counsel is not required to raise all non-frivolous claims on appeal. *Id.*; *see also Jones v. Barnes*, 463 U.S. 745, 751 (1983). Rather, the "hallmark of effective advocacy" by appellate counsel is the "winnowing out" of weaker arguments in order to focus on one or two key issues that present "the most promising issues for review." *Jones v. Barnes*, 463 U.S. at 751-53; *see also Mayo v. Henderson*, 13 F.3d 528, 534 (2d Cir. 1994) (holding that a petitioner can establish constitutionally inadequate performance by showing that counsel "omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker").

With respect to his claim that his final appellate counsel, Norbert Higgins, was ineffective, petitioner neglects to mention that Higgins not only argued the three claims suggested by the Appellate Division, but also briefed several additional claims–namely, that trial counsel had provided ineffective assistance on several bases claims.  In order to satisfy the first

prong of *Strickland*, it is not enough for a petitioner to show that appellate counsel omitted a non-frivolous argument. *Aparicio v. Artuz*, 269 F.3d at 95. Petitioner, however, has not come forward with any potentially meritorious claims that he believes appellate counsel should have raised–apart from, possibly, his claim that a toxicology report of the victim should have been produced. However, Gilliam cannot demonstrate that he was prejudiced by failure of his third appellate counsel to advance a claim that such a toxicology report–assuming that it existed or could have been obtained. The trial testimony established that Stalis had been drinking beer the night he was killed and, in any event, a showing that Stalis was intoxicated would not have resulted in a successful appeal, particularly in light of the overwhelming evidence of petitioner's guilt. Petitioner has set forth no viable, alternative claim counsel could have presented for which there is a "reasonable probability" that, it if had been raised, "the result of the [appeal] would have been different." *Strickland*, 466 U.S. at 694. His inability to show that he was prejudiced by his appellate counsel's performance means that he cannot prevail on his claim that appellate counsel did not provided constitutionally effective representation. Accordingly, I recommend that this claim be dismissed.

## V.    Conclusion

For the reasons set forth above, the Court recommends that the petition for a writ of habeas corpus filed by petitioner be denied. Furthermore, the Court finds that petitioner has not made a "substantial showing of the denial of a constitutional right" pursuant to 28 U.S.C. § 2253(c)(2) ("A certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right."); *see also Lucidore v. New York State Div. of Parole*, 209 F.3d 107, 112 (2d Cir. 2000). Therefore, the Court recommends that no

certificate of appealability should issue with respect to any of petitioner's claims.

/s/ *Victor E. Bianchini*

_____

VICTOR E. BIANCHINI
United States Magistrate Judge

Dated: June 26, 2009
Buffalo, New York.

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED**, that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within ten (10) days after receipt of a copy of this Report and Recommendation in accordance with the above statute, Fed. R. Civ. P. 72(b) and Local Rule 72.3(a)(3).

The District Court ordinarily will refuse to consider on *de novo* review arguments, case law and evidentiary material which could have been, but was not, presented to the Magistrate Judge in the first instance. *See*, *e.g.*, *Patterson-Leitch Co., Inc. v. Massachusetts Municipal Wholesale Electric Co.*, 840 F.2d 985, 990-91 (1st Cir. 1988).

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.** *Thomas v. Arn*, 474 U.S. 140 (1985); *Wesolek v. Canadair Ltd.*, 838 F.2d 55 (2d Cir. 1988); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

The parties are reminded that, pursuant to Rule 72.3(a)(3) of the Local Rules for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." **Failure to comply with the provisions of Rule 72.3(a)(3), or with the similar provisions of Rule 72.3(a)(2) (concerning objections to a Magistrate Judge's Decision and Order), may result in the District Court's refusal to consider the objection.**

Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to petitioner and respondent.

**IT IS SO ORDERED.**

/s/ *Victor E. Bianchini*

_____

VICTOR E. BIANCHINI
United States Magistrate Judge

Dated: June 26, 2009
      Buffalo, New York.